UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| EDWARD B. HERNANDEZ, JR., | ) | 1:07cv0452 LJO DLB HC |
| | ) | |
| Petitioner, | ) ) ) ) | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | ) ) | (Document 1) |
| KATHY MENDOZA-POWERS, Warden, | ) ) ) ) | |
| Respondent. | ) ) | |

Petitioner Edward B. Hernandez ("Petitioner") is a state prisoner proceeding through counsel with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections and Rehabilitation ("CDCR") pursuant to a valid judgment and conviction in the Sacramento County Superior Court for second degree murder with a firearm use enhancement. Petitioner was sentenced to 17 years to life in state prison. Exh. A, attached to Answer. His term began on July 17, 1986.

In the instant petition, Petitioner does not challenge the validity of the state court judgment. Rather, he challenges the March 1, 2005, decision by the Board of Parole Hearings ("BPH") denying parole at his third parole consideration hearing. Exh. 1, attached to Petition.

Petitioner filed a petition for writ of habeas corpus in the Sacramento County Superior Court. The petition was denied on February 15, 2006. Exh. 7, attached to Answer.

Petitioner next filed a petition for writ of habeas corpus in the Third District Court of Appeal. The petition was denied on July 13, 2006. Exh. 8, attached to Answer.

Petitioner filed a petition for writ of habeas corpus in the California Supreme Court, which was denied on February 14, 2007. Exh. 9, attached to Answer.

Petitioner filed the instant federal petition for writ of habeas corpus on March 19, 2007. He argues that (1) the actions of the Sacramento County Superior Court amount to judicial misconduct; (2) there is no evidence to support any of the reasons given to deny parole; and (3) the BPH failed to consider many of their own parole suitability criteria.

Respondent filed an answer to the petition on August 8, 2007. Petitioner filed his traverse on September 6, 2007.

## FACTS OF THE COMMITMENT OFFENSE[1]

Nicknamed "Shady," Petitioner trained at the Washington Neighborhood Center in hopes of someday boxing in the Olympics. Although not a boxer, Isidro Joseph Garcia also went to the center to play handball in the gym. He too had a nickname -- "Speedy." Petitioner and Garcia were friends, and when together, they got along without incident until the day of the fatal shooting. Petitioner and his girlfriend, who later became his wife, Maria Savala Hernandez (Savala), fought often and would break-up only to make-up and date once again. Prior to the victim's death, Petitioner and Savala were in the break-up mode.

Just three days before his death, Garcia started seeing Savala. Accompanied by Olga Samudio and another friend, Savala rode around with the victim in his car. For three days in a row, the four of them drove around and on the last day, February 21, 1985, Garcia dropped everyone off around 3 or 4 p.m. As he was curious whether Savala was seeing Garcia, Petitioner called Samudio a couple of days before the victim's death. Although repeatedly asked, Samudio did not tell him. At trial, she stated that Petitioner told her that he would find out and would beat

---

[1] This statement of facts is taken from the March 4, 1988, opinion of the Third District Court of Appeal affirming Petitioner's conviction and sentence. Exh. 3, attached to Answer.

up Savala if such was true.  Late in the evening, Petitioner went to Savala's house.  They argued and Petitioner pulled her hair away from her neck looking for "hickeys."

Sometime after dropping off Savala and her friends, Garcia went home.  In the early evening, he offered to sell a pair of pants he had in order to get some money to buy his family something to eat at McDonald's.  When he left home he was wearing a white T-shirt, gray sweatpants and tennis shoes.  Petitioner and his mother went to McDonald's restaurant on Fruitridge Avenue.  After receiving their food order, they sat down and started eating.  Thereafter, Garcia entered the same McDonald's restaurant and placed his order for four hamburgers, four cheeseburgers and a quarter pounder.  As he stood at the counter, the victim was approached from behind by Petitioner who said either, "I've been looking all over for you," or "I've been looking for you all day."  Petitioner and Garcia exited the restaurant and stood facing each other, the victim leaning against a gas meter and Petitioner leaning against a car.  As he passed between Petitioner and Garcia on his way to the trash bin, David Bingenheimer, a McDonald's employee, observed them standing approximately one and one-half feet apart, neither one of them with anything in his hands, and overheard one of them use the term "greenbud" in an apparently serious conversation.  Shortly after Bingenheimer reentered the restaurant, the other employees and patrons heard three to five loud noises as if a car had backfired or firecrackers or a gun had gone off.  Immediately thereafter, Petitioner opened the door to the restaurant and yelled "Come on mom, let's go."  Petitioner's mother exclaimed either "What's happening" or "Oh, no, what did you do" or "are you doing?"  She quickly ran out of the restaurant and entered a van with Petitioner in the passenger side and drove off.  Petitioner attempted to shield his face as they left the parking lot.

## **BPH PROCEEDINGS[2]**

On March 1, 2005, the BPH held Petitioner's Subsequent Parole Consideration Hearing.  Parole was previously denied for three years on July 30, 2001.

The BPH incorporated the following facts, taken from the counselor's BPH report dated July 2004, relating to the commitment offense into the record:

---

[2] Exh. 2, attached to Answer.

> On February 21, 1985, just prior to 7:30 p.m., the victim, Isidiro Garcia, entered McDonald's restaurant near Stockton Boulevard and Fruitridge Road in Sacramento. While the victim was standing in the food order line, he was approached by Edward Hernandez, who reportedly told the victim that he had been looking for him. They spoke briefly and then the victim walked out into the parking lot followed by Edward Hernandez. A short time later gunshots were heard. Edward Hernandez then opened the east door to the restaurant and told a female, who had accompanied him, come on, let's get out of here. The female ran out of the restaurant and entered the driver's side of the vehicle with Hernandez as a passenger. The vehicle drove west on Fruitridge. The autopsy report revealed that the victim was shot five times apparently with a .25 caliber, like a -- There was a gunshot wound which perforated the heart, a gunshot would which perforated the diaphragm, spleen and left kidney, a gunshot wound that perforated the lumbar vertebrae column, and finally a gunshot to the right back perforated the superior pole of the right kidney and right diaphragm. The cause of death was multiple gunshot wounds.

Exh. 2, attached to Answer, at 11-13.

Petitioner indicated that he did not dispute any facts of the case and took full responsibility for his actions. He chose not to further discuss the case.

The BPH also read a portion of a letter from Sacramento Chief of Police Albert Najera into the record:

> In 1985 Edward Hernandez, age 19 years, was involved in a tumultuous relationship with Maria Zavala, age 16 years. Maria Zavala broke the relationship between them. She stated that Edward Hernandez was extremely jealous. Maria Zavala had begun casually dating Isidro Garcia for approximately one week. Zavala advised detectives that two days before the murder of Isidro Garcia, Edward Hernandez confronted her. Edward Hernandez came to her house unexpectedly and grabbed Maria Zavala by the hair and threatened her about her relationship with Isidro Garcia. Witnesses would later advise detectives that Edward Hernandez had said that if he ever found Maria Zavala with Isidro Garcia together he would kill him.

Exh. 2, attached to Answer, at 14-15.

The BPH reviewed Petitioner's prior criminal record (six months probation in 1982 for assault and battery). It recounted his personal life as well as numerous letters of support and offers of employment upon release. The BPH also read into the record a portion of Chief Najera's letter in which he opposed parole for Petitioner due to "his callous nature towards others and his lack of respect for the law." Exh. 2, attached to Answer, at 40.

The BPH then reviewed Petitioner's post-conviction factors. Since his last parole hearing, he has been involved in Anger Management Programs, a Creative Conflict Resolutions workshop and Parenting Education Program. His last CDC-115 was in 1997. Petitioner's correctional counselor found him to pose a low degree of threat to the public if released.

1  Petitioner received his GED while in prison, completed a Microfilm Technology Course and
2  passed the Automotive Service Excellence test in brakes. He also received Certificates of
3  Achievement in Braille and Closed Caption and a certificate as a shear operator. Exh. 2, attached
4  to Answer, at 42-43, 51. The BPH also reviewed numerous laudatory chronos.

5        The BPH next reviewed a December 29, 2004, psychological evaluation performed by
6  Stephen Walker, Forensic Psychologist. Dr. Walker concluded that overall, Petitioner posed a
7  low to moderately low likelihood of becoming involved in a violent offense if released to the free
8  community. Exh. 2, attached to Answer, at 55.

9        Deputy District Attorney Rod Norgaard addressed the Board and commended Petitioner
10  on his progress. However, given the level and the nature of the offense, DA Norgaard opposed
11  parole. Specifically, he indicated that the crime showed an "unusual level of violence" and was
12  extremely callous. Exh. 2, attached to Answer, at 60-61.

13        After reviewing the information, the BPH determined that Petitioner was not suitable for
14  parole and would pose an unreasonable risk of danger to society. It based its decision on its
15  belief that the offense was carried out in an especially cruel, callous and dispassionate manner. It
16  also cited Petitioner's prior conviction for assault and battery and his failure to "profit" from
17  probation, and his three CDC-115s, the last of which was issued in 1997. The BPH also found
18  that given the length of his incarceration, he has not taken advantage of a sufficient number of
19  self-help programs. The BPH also cited the opposition to parole from Chief Najera and DA
20  Norgaard. It described his gains as "recent," and explained that he must demonstrate gains over
21  an extended period of time. As to his last CDC-115 in 1997, the BPH considered this "recent"
22  and explained that Petitioner had to demonstrate that he could go longer than seven years without
23  getting into a physical altercation. As for positive factors, the BPH noted the December 2004
24  psychological evaluation, his sufficient parole plans and his marketable skills. It commended
25  him for receiving his GED and completing numerous vocational courses, and for participating in
26  a variety of self-help programs.

27
28

**DISCUSSION**

A.	AEDPA Standard of Review

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), cert. denied, 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), quoting Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), cert. denied, 520 U.S. 1107 (1997), overruled on other grounds by Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA and it is therefore governed by its provisions.

Petitioner is in custody of the CDCR pursuant to a state court judgment. Even though Petitioner is not challenging the underlying state court conviction, 28 U.S.C. § 2254 remains the exclusive vehicle for his habeas petition because he meets the threshold requirement of being in custody pursuant to a state court judgment. Sass v. California Board of Prison Terms, 461 F.3d 1123, 1126-1127 (9th Cir.2006), citing White v. Lambert, 370 F.3d 1002, 1006 (9th Cir.2004) ("Section 2254 'is the exclusive vehicle for a habeas petition by a state prisoner in custody pursuant to a state court judgment, even when the petition is not challenging his underlying state court conviction.'").

Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer v. Andrade, 538 U.S. at 70-71.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, quoting 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions

6

as of the time of the relevant state-court decision." Id., quoting Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, quoting 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states, Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Clark v. Murphy, 331 F.3d 1062, 1069 (9th Cir.2003); Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir.1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct. 28 U.S.C. § 2254(e)(1). We are bound by a state's

1  interpretation of its own laws.  Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), cert. denied,
2  537 U.S. 859 (2002), rehearing denied, 537 U.S. 1149 (2003).

3  B.   Standard Governing Parole Release Determinations

4  A parole release determination is not subject to all of the due process protections of an
5  adversary proceeding. Pedro v. Oregon Parole Board, 825 F.2d 1396, 1398-99 (9th Cir. 1987);
6  see also Greenholtz v. Inmates of Nebraska Penal and Corr. Complex, 442 U.S. 1, 12 (1979)
7  (explaining that due process is flexible and calls for procedural protections that particular
8  situations demand).  "[S]ince the setting of a minimum term is not part of a criminal prosecution,
9  the full panoply of rights due a Petitioner in such a proceeding is not constitutionally mandated,
10 even when a protected liberty interest exists." Pedro, 825 F.2d at 1399; Jancsek v. Oregon Bd. of
11 Parole, 833 F.2d 1389, 1390 (9th Cir.1987).

12 At a state parole board proceeding, an inmate is entitled to the following procedural
13 protections: 1) the inmate must receive advance written notice of a hearing, Pedro, 825 F.2d at
14 1399; 2) the inmate must be afforded an "opportunity to be heard," Greenholtz, 442 U.S. at 16;
15 and 3) if the inmate is denied parole, the inmate must be told why "he falls short of qualifying for
16 parole." Id.

17 As to these procedural protections, as Respondent submits, Petitioner was provided all
18 that is required.  Petitioner was provided with advance notice of the hearing, an opportunity to
19 submit materials for the BPH's consideration, an opportunity to be heard during the hearing,
20 representation by his attorney, and a written decision explaining the reasons that parole was
21 denied.

22 "In Superintendent, Mass. Correc. Inst. v. Hill, the Supreme Court held that 'revocation
23 of *good time* does not comport with 'the minimum requirements of procedural due process,'
24 unless the findings of the prison disciplinary board are supported by some evidence in the
25 record.' 472 U.S. 445, 454 (1985), quoting Wolff v. McDonnell, 418 U.S. 539, 558 (1974)."
26 Sass v. California Board of Prison Terms, 461 F.3d 1123, 1128 (9th Cir.2006) (emphasis added).
27 The Ninth Circuit has held that this same standard also extends to parole determinations. Irons v.
28 Carey, 505 F.3d 846, 851 (9th Cir.2007), quoting Hill, 472 U.S. at 457 ("We have held that 'the

8

1  Supreme Court ha[s] clearly established that a parole board's decision deprives a prisoner of due
2  process with respect to this interest if the board's decision is not supported by 'some evidence in
3  the record,' or is 'otherwise arbitrary.'"). In assessing "whether a state parole board's suitability
4  determination was supported by 'some evidence' in a habeas case, our analysis is framed by the
5  statutes and regulations governing parole suitability determinations in the relevant state." Irons,
6  505 F.3d at 851. Here, the Court must look to California law and review the record. In
7  reviewing the record and determining whether the "some evidence" standard is met, the Court
8  need not examine the entire record, independently assess the credibility of witnesses, or re-weigh
9  the evidence. Sass, 461 F.3d at 1128.
10         California law provides that after an inmate has served the minimum term of confinement
11 required by statute, the BPH "shall set a release date unless it determines that the gravity of the
12 current convicted offense or offenses, or the timing and gravity of current or past convicted
13 offense or offenses, is such that consideration of the public safety requires a more lengthy period
14 of incarceration for" the prisoner. Cal. Penal Code § 3041(b). "[I]f in the judgment of the panel
15 the prisoner will pose an unreasonable risk of danger to society if released from prison," the
16 prisoner must be found unsuitable and denied parole. Cal. Code Regs. tit. 15, § 2402(a). The
17 BPH decides whether a prisoner is too dangerous to be suitable for parole by applying factors it
18 has set forth in the California Code of Regulations.
19 C.     Analysis of Petitioner's Claims
20         1.     Superior Court Opinion
21         As a threshold matter, the Court rejects Petitioner's argument that the Sacramento
22 Superior Court decision is not entitled to deference under AEDPA. Ylst v. Nunnemaker, 501
23 U.S. 797 (1991) (court utilizes last reasoned decision on habeas review). Specifically, Petitioner
24 argues that the Sacramento Court committed judicial misconduct and this Court should therefore
25 conduct a de novo review.
26         Petitioner's argument is based on the procedural history of his habeas petition at the
27 superior court level. Shortly after he filed his petition, he moved to disqualify the assigned
28 judge, Judge Greta Fall. A week later, on January 17, 2006, Judge Fall issued an order denying

1 the petition. Judge Fall vacated the order the following day and the case was reassigned to Judge
2 Balonon. Petitioner moved to seal Judge Fall's order to ensure de novo review by Judge
3 Balonon, but the motion was denied. On February 15, 2006, Judge Balonon issued his order
4 denying the petition. The order, as Petitioner contends, is almost an exact copy of the January
5 17, 2006, order issued by Judge Fall. He therefore believes that Judge Balonon's order is biased
6 against him.

7 Indeed, the two orders are quite similar. However, there is no evidence that Judge
8 Balonon did not review the order or otherwise adopt it as his own without thought. In fact, there
9 are numerous small changes, which suggests that the prior order was carefully reviewed.

10 Additionally, Petitioner moved to disqualify Judge Fall based on counsel's belief that she
11 was "biased against state prisoner filings or for some other reason does not pay close attention to
12 the issues raised in said filings." Exhibit L, attached to Petition, at 3. However, both her
13 decision and the one subsequently issued by Judge Balonon, include thorough discussions of
14 each issue raised by Petitioner. Judge Balonon's order is 6 pages in length and analyzes each of
15 Petitioner's claims independently. Petitioner does not contend otherwise.

16 Accordingly, the Court will apply the usual AEDPA standards in reviewing Petitioner's
17 case.

18     2.    Evidence Supporting BPH Decision

19 Petitioner's main argument focuses on his belief that there is no evidence to support any
20 of the reasons set forth by the BPH in denying parole.

21 *Circumstances of Petitioner's Crime*

22 Petitioner first faults the BPH for focusing on the manner in which he committed the
23 crime. He contends that the record does not support the BPH's finding that the crime was carried
24 out in an especially cruel, callous and dispassionate manner, and the motive for the crime was
25 "very trivial" in relation to the offense (i.e., as a result of jealously over a girlfriend). Exh. 2,
26 attached to Answer, at 70-71.

27 Under California law, the commitment offense and past convicted offenses alone provide
28 a sufficient basis to deny parole. In re Dannenberg, 34 Cal.4th at 1061, 1095 (2005); Cal. Penal

1  Code § 3041(b). In order to find that an offense was committed "in an especially heinous,
2  atrocious or cruel manner" there must be some evidence that the "violence and viciousness of the
3  inmate's crime" is greater than that which is "minimally necessary to convict [the Petitioner] of
4  the offense for which he is confined." In re Dannenberg, 34 Cal.4th at 1095 (internal citations
5  omitted).

6       "Some evidence" existed in the record before the BPH.  Simply put, Petitioner shot the
7  victim *five* times after indicating inside the McDonald's that he had been looking for him.
8  Petitioner did not dispute these facts at the hearing, and in any event, it is not this Court's task on
9  review to re-weigh the evidence.  Sass, 461 F.3d at 1128.  Petitioner makes numerous arguments
10 challenging the BPH's interpretation of the evidence, suggesting that the shots were not "drawn
11 out" so as to cause undue suffering or pain and contending that there was no evidence that he
12 made the victim walk outside.  However, the Court must ask whether there was "some evidence"
13 in the record to support the BPH's conclusion, and will not undertake review of what the record
14 *did not* show.  Although Petitioner disagrees with the BPH's finding, it was supported by "some
15 evidence" in the record.

16      Petitioner also suggests that there is no nexus between the factors of the crime and a
17 current public safety concern.  He relies on the fact that almost 20 years had passed since the
18 crime, and contends that it is nothing but speculation or conjecture to conclude that he is more
19 likely than any other person to act violently.  Yet Petitioner's crime itself separates him from
20 other individuals and the BPH was entitled to examine the circumstances of his crime, as
21 discussed above.  Moreover, as the BPH noted, Petitioner committed the crime in an area "where
22 there were other individuals," and his actions put countless lives at risk.  Exh. 2, attached to
23 Answer, at 70.  Unbelievably, Petitioner suggests that his crime did not pose a risk to others
24 because there were no people in sight of the crime and "every bullet fired hit the victim."
25 Petition, at 36.  That Petitioner is an accurate shooter or the fact that the other restaurant patrons
26 remained inside does not change the fact that Petitioner shot the victim repeatedly in front of a
27 McDonald's restaurant, in the early evening, when the risk of unintentionally injuring other
28 people was undoubtedly high.

Insofar as Petitioner suggests that the consideration of his crime rose to the level of violating his right to due process, his argument also fails.  While it is true that in Biggs v. Terhune, 334 F.3d 910, 916-17 (9th Cir.2003), the Ninth Circuit stated that "[a] continued reliance in the future on an unchanging factor, the circumstance of the offense and conduct prior to imprisonment, runs contrary to the rehabilitative goals espoused by the prison system and could result in a due process violation," this is not the situation here.  As discussed below, the BPH relied on more than just the commitment offense to find Petitioner an unreasonable risk to society.  Nonetheless, this Court acknowledges that at some point in time the circumstances of Petitioner's commitment offense may no longer weigh in support of a finding that he currently poses an unreasonable risk to public safety.  On this record, though, "some evidence" exists to support the decision.

*Petitioner's Prior Record*

Next, Petitioner disagrees with the BPH's reliance on his prior record, which consisted of an assault and battery conviction as a juvenile.  Petitioner offers his version of the events that led to the assault and battery conviction, explaining that he got "caught up" in a fight between to families and kicked a person between the thigh and hip.  Petition, at 19.  He also points out that he successfully completed his probation.  Petitioner, however, does not dispute the fact of the prior conviction, and "some evidence" therefore supports the BPH's citation to Petitioner's prior record as a circumstance tending to indicate his unsuitability for parole.  See Cal.Code Regs. tit. 15, § 2402(b), (c)(6).

*Petitioner's Prison CDC-115s*

Petitioner also disagrees with the BPH's reliance on the three CDC-115s that he received in prison, with the most recent occurring in 1997.  Exh. 2, attached to Answer, at 72.  In so arguing, he attempts to downplay the incidents by providing the Court with additional details of the violations.

For instance, as to the first violation in 1994 for assault and battery with a weapon (a broken broom), all inmates in the housing unit received a CDC-115 because correctional staff could not identify the individuals involved.  Petitioner asserts that another inmate later claimed

full responsibility for the incident and attaches the inmate's admission. Exh. J, attached to Petition. Yet, as the Superior Court noted, Petitioner does not provide his own CDC-115 relating to this incident or any other evidence that otherwise exonerated Petitioner.

As to the remaining two CDC-115s, Petitioner explains that he received them while housed at Corcoran State Prison during a time where "correctional staff intentionally placed inmates from opposing geographic locations and/or ethnic groups on prison yards" and the "dynamics of prison politics require[d] these inmates to fight each other..." Petition, at 21. He describes the scenes as staged "gladiator" type events and attaches an article on Corcoran Prison violence. Exh. I, attached to Petition. Petitioner's attempt to explain the environment at Corcoran, however, does not validate his decision to engage in assaultive behavior on two occasions.[3]

Insofar as Petitioner contends that the passage of almost eight years from his last CDC-115 renders him less of a current danger to society, he is correct. However, as the BPH explained in its decision, his gains are "recent" and he must demonstrate the ability to go more than seven years without demonstrating any violence. Exh. 2, attached to Answer. Although he has not suffered any disciplinary infractions since 1997, the BPH must consider the entire record of incarceration, and "some evidence" supports the finding that Petitioner has made an inadequate showing of positive change and therefore still presents an unreasonable danger to public safety.

*Participation in Self-Help Programs*

Petitioner turns next to the BPH's analysis of his participation in "self-help programs," arguing that the BPH's assertion that he had not sufficiently participated in self-help programs should have been supported with examples of specific programs that he had declined.

In its decision, the BPH found that given the amount of time Petitioner had been in prison, it expected that he would have participated in more programs. Indeed, at the time of the hearing, Petitioner had been incarcerated for almost 20 years. While the BPH acknowledged that

---

[3] Petitioner reminds the Court that it is difficult for those who have not been in the prison setting to understand its dynamics. While this is true, it is not for the Court to conduct an evidentiary inquiry into the circumstances of Petitioner's CDC-115s. Sass, 461 F.3d at 1128.

13

he did participate in many programs, it was within its discretion to deem the amount of participation insufficient. As previously noted, the BPH must consider "[a]ll relevant, reliable information available" in determining Petitioner's suitability for parole. Cal. Code Regs. tit. 15, § 2402(b). Although the BPH commended Petitioner on his participation, it was entitled to find that his participation was insufficient for parole suitability purposes.

*Opinion of Chief of Police and District Attorney*

Finally, Petitioner contends that the BPH should not have considered the opposition from the Chief of Police and Deputy District Attorney, arguing that the "blessing" of such individuals is not a required finding for parole suitability. While their "blessing" is required, the BPH was entitled to take their opinions into consideration pursuant to California Penal Code section 3042(a) and (f)(3), and Cal. Code Regs. title 15, section 2402(b). Petitioner believes that the opinions do not act as evidence of any fact, but this does not change the fact that such opinions are properly considered.

In summary, Petitioner's argument that none of the factors cited by the BPH are supported by evidence fails for the reasons stated above. The decision of the BPH was supported by "some evidence," and the decision of the Superior Court was not contrary to, or an unreasonable application of, clearly established Supreme Court precedent.

3.   Suitability Factors

In a related argument, Petitioner contends that the BPH failed to consider many of its own parole suitability criteria and failed to provide individual consideration to Petitioner's case.

To the extent that Petitioner argues that some of the above factors should have been considered in favor of suitability rather than against it, the Court has discussed the issues and will not re-address them here. The fact that many of the issues could apply to "any murder fact pattern, regardless of the circumstances," does not translate into a finding that Petitioner's case was not considered individually. Petition, at 28.

Petitioner is correct that the BPH did not address each and every suitability factor listed in section 2402(d), but it was not required to do so. Section 2402(d) simply lists circumstances

1 tending to show that a prisoner is suitable for release.  The factors are set forth as "general
2 guidelines."
3     In its decision, the BPH set out numerous factors in Petitioner's favor, such as the
4 favorable psychological report, his sufficient plans if released and his marketable skills.  It
5 decided, however, that the factors against parole outweighed the suitability factors, and it was
6 entitled to engage in this weighing process.  In re Rosenkrantz, 29 Cal.4th 616, 655 (2002).
7     The state court's determination on this issue was not contrary to, or an unreasonable
8 determination of, clearly established Supreme Court precedent.  Petitioner's argument is without
9 merit and must be denied.

## RECOMMENDATION

Based on the foregoing, it is HEREBY RECOMMENDED that:

1. The instant petition for writ of habeas corpus be DENIED; and
2. The Clerk of Court be directed to enter judgment in favor of Respondent.

This Findings and Recommendation is submitted to the Honorable Lawrence J. O'Neill, United States District Court Judge, pursuant to the provisions of 28 U.S.C. section 636 (b)(1)(B) and Rule 72-304 of the Local Rules of Practice for the United States District Court, Eastern District of California.  Within thirty (30) days after being served with a copy, any party may file written objections with the court and serve a copy on all parties.  Such a document should be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the objections shall be served and filed within ten (10) court days (plus three days if served by mail) after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to 28 U.S.C. § 636 (b)(1)(C).  The parties are advised that failure to file objections within the specified time may waive the right to appeal the District Court's order.  Martinez v. Ylst, 951 F.2d 1153 (9th Cir. 1991).

IT IS SO ORDERED.

Dated:   **August 12, 2008**         /s/ **Dennis L. Beck**
                                                UNITED STATES MAGISTRATE JUDGE